## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| KIMBERLY KJESSLER, KLAIRE RUECKERT, LAURA BRALEY, TIMOTHY HAYDEN, and SUMMER LANG, individually and on behalf of all others similarly situated, | Civil Action No. 4:18-cv-430 |
| Plaintiffs, | |
| v. | **CONSOLIDATED AMENDED** <br> **CLASS ACTION COMPLAINT** |
| ZAAPPAAZ, INC., AZIM MAKANOJIYA, NETBRANDS MEDIA CORP., MASHNOON AHMED, GENNEX MEDIA, LLC, BRANDECO, L.L.C., AKIL KURJI, CUSTOM WRISTBANDS INC., and CHRISTOPHER ANGELES, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## INTRODUCTION

Plaintiffs Kimberly Kjessler, Klaire Rueckert, Laura Braley, Timothy Hayden, and Summer Lang, ("Plaintiffs"), by their undersigned counsel, individually and on behalf of all others similarly situated, allege the following against defendants Zaappaaz, Inc. ("Zaappaaz"); Azim Makanojiya ("Makanojiya"); Netbrands Media Corp. ("Netbrands"); Mashnoon Ahmed ("Ahmed"); Gennex Media, LLC ("Gennex"); Brandeco, L.L.C. ("Brandeco"); Akil Kurji ("Kurji") Custom Wristbands Inc. ("Custom Wristbands"); and Christopher Angeles ("Angeles") (collectively, "Defendants") based, as to themselves, on personal knowledge, and on information and belief in all other respects, based on the investigation of counsel.

## NATURE OF THE ACTION

1.      This is a nationwide direct-purchaser antitrust action arising out of a Department of Justice ("DOJ") investigation into a conspiracy to fix prices for customized promotional products ("CPPs"), including but not limited to customized silicone wristbands, customized lanyards, and customized pin buttons.  Plaintiffs reserve the right to alter or expand the definition of CPP based on what is revealed in the course of discovery in this case.

2.      CPPs are small, inexpensive items most often used by businesses or other organizations for promotional purposes, such as to advertise and market a given brand or piece of information.  These products are generally imprinted with a brand name, slogan, person's name, or some other bit of text or imagery at the customer's request.

3.      Individuals also purchase promotional products for various reasons, including to commemorate life events or to raise money for charitable causes.  These products are generally imprinted with a brand name, slogan, person's name, or some other bit of text or imagery at the customer's request.

4.      From at least June 2014 to at least June 2016 (the "Class Period"), with anticompetitive effects continuing to the present, a Houston-centric cartel selling at least tens of millions of dollars in CPPs used secret meetings, covert text messages, and furtive online messaging platforms to fix and maintain the prices they charged for customized promotional products.

5.      To date, the DOJ investigation into the conspiracy has resulted in guilty pleas by the following members of the cartel: (1) Zaappaaz; (2) Makanojiya (founder and president of Zaappaaz); (3) Custom Wristbands; and (4) Angeles (owner and Chief Executive Officer of Custom Wristbands).

6.     On information and belief, the DOJ's investigation is ongoing and may yet implicate additional corporations, natural persons, or types of products not yet currently known to Plaintiffs.

7.     These Defendants have all pleaded guilty to price-fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  In the press release describing the conspiracy, the DOJ stated that "the defendants and their co-conspirators agreed … to fix the prices of customized promotional products sold online, including wristbands and lanyards."

8.     In addition to their guilty pleas, Defendant Zaappaaz agreed to pay a criminal fine of $1,923,245,[1] and Defendant Custom Wristbands agreed to pay a $409,342 criminal fine.[2]

9.     Neither these cartel members nor their co-conspirators, however, have compensated the victims of the cartel for their losses.  To restore competition and remedy the harm to Plaintiffs and other direct purchasers of CPPs, Plaintiffs bring this action for treble damages, attorneys' fees, and other appropriate relief.

10.     The horizontal price-fixing conspiracy alleged herein constitutes a *per se* unreasonable restraint of trade in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Defendants' conduct has had the purpose and effect of restraining trade and harming competition, resulting in supracompetitive prices paid for certain CPPs.

---

[1]  E-Commerce Company and Top Executive Agree to Plead Guilty to Price-Fixing Conspiracy for Customized Promotional Products, United States Department of Justice (Aug. 7, 2017), https://www.justice.gov/usao-sdtx/pr/e-commerce-company-and-top-executive-agree-plead-guilty-price-fixing-conspiracy.

[2]  Second E-Commerce Company and Its Top Executive Agree to Plead Guilty to Price-Fixing Conspiracy in Customized Promotional Products Industry, Department of Justice (Aug. 22, 2017), https://www.justice.gov/opa/pr/second-e-commerce-company-and-its-top-executive-agree-plead-guilty-price-fixing-conspiracy.

## PARTIES

11.     Plaintiff Kimberly Kjessler ("Kjessler") is a natural citizen domiciled in Port Deposit, Maryland.  Ms. Kjessler purchased customized silicone wristbands and pin buttons directly from multiple Defendants on multiple occasions during the Class Period.  Unbeknownst to Ms. Kjessler, Defendants' price-fixing caused her to suffer antitrust injury.

12.     Plaintiff Klaire Rueckert ("Rueckert") is a natural citizen domiciled in Seattle, Washington.  Ms. Rueckert purchased customized silicone wristbands directly from one or more Defendants on multiple occasions during the Class Period.  Unbeknownst to Ms. Rueckert, Defendants' price-fixing caused her to suffer antitrust injury.

13.     Plaintiff Laura Braley ("Braley") is a natural citizen domiciled in Virginia Beach, Virginia.  Ms. Braley purchased customized silicone wristbands directly from one or more Defendants during the Class Period.  Unbeknownst to Ms. Braley, Defendants' price-fixing caused her to suffer antitrust injury.

14.     Plaintiff Timothy Hayden ("Hayden") is a natural citizen domiciled in Owensboro, Kentucky.  He is the President of the Necrotizing Fasciitis Foundation ("NFF"), a charitable organization that he founded.  Mr. Hayden purchased customized silicone wristbands directly from one or more Defendants on multiple occasions during the Class Period.  Unbeknownst to Mr. Hayden, Defendants' price-fixing caused him to suffer antitrust injury.

15.     Plaintiff Summer Lang ("Lang") is a natural citizen domiciled in Goodyear, Arizona.  Ms. Lang purchased customized silicone wristbands directly from Zaapaaz's website (Wrist-Band.com) during the Class Period.  Unbeknownst to Ms. Lang, Defendants' price-fixing caused her to suffer antitrust injury.

16.     Defendant Zaappaaz is a privately-held Texas corporation with its principal place of business at 1305 El Camino Village Dr., Houston, Texas, 77058-3081.  Zaappaaz does business online, including under the names "WB Promotions, Inc.", "Wrist-Band.com" and "Customlanyard.net."  Zaappaaz sells CPPs throughout the United States.

17.     Defendant Makanojiya is the president of Defendant Zaappaaz and is domiciled in the State of Texas.

18.     Defendant Netbrands Media Corp. is a Texas corporation with its principal place of business at 14550 Beechnut St., Houston, Texas, 77083-5741.  Netbrands does business as, among other names, "24hourwristbands.com" and "imprint.com".  On information and belief, Netbrands previously operated as Lightbeam Inc., a former Delaware corporation which had a principal place of business at 4850 Wright Rd., Suite 100, Stafford, Texas, 77477-4116.  Lightbeam Inc. also did business as "lightbeamlabs.com".  Netbrands sells CPPs throughout the United States.

19.     Defendant Mashnoon Ahmed is the president of Netbrands and is domiciled in the State of Texas.

20.     Defendant Gennex Media, LLC is a Texas corporation with its principal place of business at 4855 Alpine Dr., Suite 190, Stafford, Texas, 77477-4140.  Gennex does business online under the name of "brandnex.com" and, on information and belief, may be a shell corporation for the brandnex.com website.

21.     Defendant Brandeco, L.L.C. is a Texas limited liability company with its principal place of business at 8181 Commerce Drive, Suite 700, Houston, Texas 77036.  Brandeco does business online under the name "brandnex.com" and, on information and belief, may be a shell corporation for the brandnex.com website.  Brandeco and/or Gennex sell CPPs throughout the United States through the brandnex.com website.

22.     Defendant Akil Kurji is the chief executive officer of and controls Brandeco and Gennex and is domiciled in the State of Texas.

23.     Defendants Zaappaaz, Makanojiya, Netbrands, Ahmed, Gennex, Brandeco, and Kurji are sometimes referred to herein as the Houston Defendants.

24.     Defendant Custom Wristbands Inc. ("Custom Wristbands") is a California corporation with its principal place of business at 4416 W. Verdugo Ave., Burbank, California, 91505.   Custom Wristbands does business online under the names of "Kulayful Silicone Bracelets",   "Kulayful.com",   "Speedywristbands.com",   "Promotionalbands.com", "Wristbandcreations.com" and "1inchbracelets.com".  Custom Wristbands sells CPPs throughout the United States.

25.     Defendant Angeles is the owner and chief executive officer of Defendant Custom Wristbands and is domiciled in the State of California.

**JURISDICTION AND VENUE**

26.     This Court has jurisdiction pursuant to Sections 4 and 16 of The Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1.  This Court also has original federal question jurisdiction over the Sherman Act claim asserted in this Complaint pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of The Clayton Act, 15 U.S.C. §§ 15 and 26.

27.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because there are at least 100 members of the proposed class, at least one of whom is a citizen of a different state than Defendants, and the aggregate claims of the proposed class members exceed $5,000,000, exclusive of interest and costs.

6

28.     Venue is proper in this District under 28 U.S.C. § 1391 because: (i) Defendants Zaappaaz, Netbrands, Gennex, and Brandeco are all headquartered in this District; (ii) Defendant Makanojiya resides in this District; and (iii) Defendants transacted business in this District, were found with or had agents in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

## I.     THE MARKET FOR CUSTOMIZABLE PROMOTIONAL PRODUCTS

29.     Common promotional items include pens, calendars, T-shirts, coffee mugs, key chains, badge holders, wristbands, lanyards, and pin buttons.

30.     Businesses often use customized promotional items by distributing them at trade shows, providing them to customers to further brand loyalty, or furnishing them to their own employees as gifts.  Individuals also buy customized promotional items for several purposes, including to contribute to charitable organizations or to increase awareness of a particular cause.

31.     While promotional products in the United States date back to the presidential campaign of George Washington, the modern market for CPPs began in the 1970s.

32.     Beginning in the early 2000s, much of the ordering for promotional products began to be handled online, which, for the first time, allowed customers to easily compare the prices for ordering a given type of customizable promotional product according to one's need.  In turn, this required companies producing customizable promotional products to compete on price, types of products offered, quality, speed of delivery, and by feature.

33.     According to the International Network of the Promotional Product Industry, by 2016, the CPP industry in the United States had developed into a $22.9 billion industry.[3]

34.     Demand for silicone gel wristbands in particular soared after 2004, when Nike and the Livestrong Foundation (cycling champion Lance Armstrong's cancer charity) launched a yellow silicone gel wristband with the imprint "LIVESTRONG" as a symbol for cancer awareness. The Livestrong Foundation ultimately sold more than 80 million wristbands.

**A.  Customized Silicone Wristbands**

35.     Silicone wristbands are extremely easy to produce, using extruded silicone rubber, which is compressed to a pre-selected width (most commonly one-half inch).  The rubber is pre-dyed, and the customer can select whether he or she wants the customized printing to be debossed (recessed), embossed (raised), colored debossed, or screen-printed, among other options.  Most silicone wristbands are 7 or 8.5 inches in circumference and are approximately one-tenth of one inch thick, and are heavily standardized across the industry.[4]

36.     Most silicone wristband production facilities are located in China or other countries in Asia where production can occur very quickly and be rapidly shipped to the United States. However, some production is claimed to be done in the United States, and Defendants and other competitors often charge a premium for customized silicone wristbands and lanyards that they claim have been "Made in the USA".

37.     Zaappaaz and Netbrands both claim to be the largest provider of silicone wristbands in the world, while Gennex/Brandeco advertises itself as the "largest manufacturer of custom

---

[3] *See* US promotional product market: The South leads the charge in sales, The International Network of the Promotional Product Industry (Sept. 5, 2017), https://www.psi-network.de/en/Industry/US-promotional-product-market-The-South-leads-the-charge-in-sales/45/n6129/.

[4]     *See* Manufacturing and Designing Silicone Rubber Bracelets, Thomas Network, http://www.thomasnet.com/articles/plastics-rubber/silicone-bracelet-design (last visited Oct. 1, 2018).

wristbands in the world."[5]  Custom Wristbands similarly lays claim to being a large producer. Market share data for the silicone wristband market is not publicly available, but to Plaintiffs' knowledge no other providers of silicone wristbands advertise themselves as being the largest.

38.     Defendants Zaappaaz, Netbrands, Custom Wristbands, and Gennex/Brandeco all use very similar online platforms to sell customized silicone wristbands.

**B. Customized Lanyards**

39.     Customized lanyards are produced in a method very similar to that of customized silicone wristbands, though instead of using extruded silicone rubber, most lanyards are made from polyester, nylon, or other easy-to-produce synthetic materials.  As with customized silicone wristbands, the customer can easily select the type and style of printing, along with other standard aspects of production, including the clasp and the badge holder.

40.     Turnaround times are similarly generally low, and can be ordered on little notice, often shipped from China or other countries in Asia.  Due to the ordering process, prices can be easily monitored online, just as with customized silicone wristbands.  Defendants Zaappaaz, Netbrands, Custom Wristbands, and Gennex/Brandeco all use very similar online platforms to sell customized lanyards.

---

[5] *See* 24 Hour Wristbands Home Page, https://24hourwristbands.com/ (last visited Oct. 1, 2018) ("We are the largest manufacturer of custom wristbands in the world."); L.M. Sixel, Local wristband/lanyard maker plead guilty on price fixing charge, Houston Chronicle (Aug. 15, 2017, 12:27 PM), http://www.chron.com/business/bizfeed/article/Local-wristband-lanyard-maker-plead-guilty-on-11820700.php, last accessed Aug. 29, 2017 ("A Sugar Land company that calls itself the largest U.S. seller of promotional wristbands and lanyards along with its top executive agreed to plead guilty to conspiring to fix prices for customized products by using social media platforms and encrypted messaging applications."); Wrist-Band.Com Home Page, https://www.wrist-band.com (last visited Oct. 1, 2018) ("We are the largest and most reliable supplier in the field of customized wristband[s] which is the most widely used promotional product."); About Us, BrandNex.com, http://www.brandnex.com/themeb/aboutus.php (last visited Oct. 1, 2018) ("…we take pride in being one of the largest manufactures [sic] of promotional products in the United States!").

### C.  Customized Pin Buttons

41.    Pin buttons are buttons or badges that attach to an article of clothing using an attached safety pin.  Most pin buttons are flat or rectangular, and they carry images or messages. Pin buttons are most commonly known from political campaigns, but today serve numerous other purposes.

42.    Customized pin buttons are produced in a method very similar to that of customized silicone wristbands and lanyards.  The pins are standardized across a range of options, such as size and shape, but the front message or image can be chosen almost entirely by the customer.  Some customized pin buttons are installed on keychains or with magnetic backings instead of using safety pins, though all are considered to be "customized pin buttons" within the industry meaning of the term.

43.    Turnaround times are also generally low for customized pin buttons, and can be ordered on little notice, often shipped from China or other countries in Asia.  Due to the ordering process, prices can be easily monitored online, just as with customized silicone wristbands and lanyards.

44.    At least one Defendant, Zaappaaz, owns or operates manufacturing facilities that are strategically located in China, close to an airport, to facilitate expedited delivery of the company's products.

45.    Defendants Zaappaaz, Netbrands, and Brandeco/Gennex all use very similar online platforms to sell customized pin buttons.

## II.    RELEVANT INDUSTRY CHARACTERISTICS

### A.  The Ordering System for Promotional Products

46.    All corporate Defendants' ordering systems for customized silicone wristbands and lanyards are highly similar: a customer begins by choosing a type of printing (*e.g.*, printed, debossed, or embossed), a width, a color, a customized message, logo, or picture, a method of bagging, and then the type or speed of shipping or production.

47.    Similarly, customized pin buttons use a pre-set selection of sizes and shapes of buttons, upon which a custom image or message is printed.  Pin buttons can also be made with magnetic backs or as keychains.

48.    Customized Promotional Products, therefore, are undifferentiated commodity-like products.  A commodity-like product is one that is standardized across producers and allows for a high degree of substitutability among different producers in the same market.  This means that customers decide which supplier's products to purchase primarily on the basis of price.  By the same token, price is the primary means by which suppliers may compete for business.

49.    The prices for all three products are clearly quoted at the bottom of the ordering screen and are similar across Defendants' platforms.  The vast majority of customers, if any, do not negotiate prices as part of the purchase process.  Accordingly, it is very easy for customers to compare prices through entering similar or identical orders on Defendants' websites, and similarly, competitors can easily monitor each other's prices.

50.    Due to the commodity-like nature of these products as well as the low cost of manufacturing and shipping and the ease of ordering online and comparing offers from different vendors, competition – in the absence of collusion among the Defendants – would be fierce, and would require extremely small margins and highly responsive customer service.  However, as

11

evidenced by criminal informations filed against Defendants Makanojiya and Zaappaaz, in order to increase margins and reduce competition, Defendants opted not to compete on price and instead set prices via text messages, meetings, and social media messaging platforms.

51.     Defendants' anticompetitive actions resulted in supra-competitive prices and profits at the expense of consumers of CPPs.

### B. Market Concentration

52.     Market concentration facilitates collusion among participants.  If many companies sell the same product, companies that are not part of the conspiracy can erode cartel members' market shares by offering products at lower, more competitive prices, undercutting the cartel.

53.     During the Class Period, the CPP industry was, on information and belief, dominated by relatively few companies.  As set forth elsewhere in this Complaint, Defendants claim to be industry leaders and often boast that they are the largest supplier of CPPs in the country. For example, on information and belief, the Houston Defendants, together with Custom Wristbands, held a collective 90% share of the market for customized silicone wristbands.

54.     The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

55.     Given the relative lack of significant competing CPP suppliers who were not a part of the cartel, Defendants' concerted actions have had the ability to affect and have affected pricing for CPPs in the United States.

### C.  Opportunities to Collude

56.     The relationship between the executives of certain companies, along with the presence of many CPP businesses in the Houston area, provided many opportunities for Defendants to discuss and exchange competitive information.

57.     The ease of communication was facilitated by the use of meetings, telephone calls, chat rooms, and instant messages.  Defendants took advantage of these opportunities to discuss, and agree upon, the pricing for CPPs, as alleged below.

58.     As a result of these various interactions, Defendants were often acutely aware of their competition and, more importantly, each other's current and future business plans.  This type of familiarity and opportunity often leads to agreements among competitors to fix prices – as was the case here – or to allocate a given market so as to avoid competing with one another on price.

### D.  Mutual Interchangeability of Defendants' Products

59.     When products offered by different companies are viewed by purchasers as interchangeable, the suppliers can more easily agree on a single price for the product in question, and effectively monitor pricing to enforce their agreement.  Thus, when a product is a commodity that is interchangeable with other products, conditions are ripe for an anticompetitive cartel.

60.     As described herein, the CPPs manufactured or sold by Defendants are interchangeable and reasonable substitutes for one another.  Although these products are, by definition, customizable, many factors are standardized across the industry.  For example, silicone wristband features such as width and color, lanyard material and clip, and method of customization (*e.g.*, embossment or debossment) are standardized across the industry.  The customizable options for customized lanyards and pin buttons are similarly standardized across the industry.

61.     One Defendant's customized promotional product is substitutable for another's. Accordingly, Defendants sold and Plaintiffs purchased CPPs primarily on the basis of price.

62.     It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

## III.    THE NATURE OF THE CONSPIRACY

### A.  The Tumultuous Past of Zaappaaz and Netbrands

63.     In 2007, while a student at the University of Houston, Defendant Makanojiya was reportedly attending a trade show in China when he saw how customized silicone wristbands could be mass-produced.  Inspired by the success of the Livestrong wristbands, and not aware of any website in the United States that allowed customers to design their own customized wristbands, he created Wrist-Brand.com.

64.     In interviews describing his interest in the CPP industry, Makanojiya has stated that "[t]here was a significant amount of traffic … for the keyword[s] *silicone wristbands*."[6]  (emphasis in original).  Taken as true, this may indicate that many customers seeking to order customized silicone wristbands primarily seek to do so online, in order to easily compare pricing and features.

65.     Defendant Netbrands was also founded in 2007, by Defendant Ahmed, along with Aziz Mansoor and Mueen Akhter.  By 2012, Netbrands stated that it had yearly sales of approximately $36 million.[7]

---

[6] *See* Raif Karerat, A school project spawned into a multimillion dollar company for Azim Makanojia [sic], The American Bazaar (Jan. 19, 2015), https://www.americanbazaaronline.com/2015/01/19/school-project-spawned-multimillion-dollar-company-azim-makanojia/.

[7] *See* Mike, A Few Wristbands, A Few Years, A Few Million Dollars, One Million in the Bank (May 7, 2014), http://onemillioninthebank.com/a-few-wristbands-a-few-years-a-few-million-dollars/.

66.     Ahmed and Mansoor, in particular, were regular participants in the cartel's chat rooms, as discussed below, and often spoke directly to Defendants Makanojiya, Angeles, and Kurji.

67.     Netbrands is not new to the realm of federal crimes.  In 2010, the United States, through the Office of the Inspector General of the Social Security Administration, sued Netbrands and Mansoor under the Social Security Act and federal mail and wire fraud laws for attempting to mislead and defraud the public with the websites "www.ssnhome.com" and "ssnoffice.com."[8]

68.     In its complaint, the United States accused Netbrands of creating a website that gives the impression of being part of the Social Security Administration, as well as for charging for services through its website that are provided free of charge by the federal government (specifically applying for a social security card).[9]

69.     Additionally, Netbrands has held a long-running scam on its website, dating to at least 2012[10], that advertises "100 Free Wristbands with Every Order!" – usually with a fictional expiration of that same hour or same day.  However, Netbrands offers no additional explanation of the offer in a separate link or fine print for the terms of the "free" wristbands and routinely bills an additional substantial charge to the customer's order for the additional "free" wristbands. Tactics like this show that Netbrands, like Zaappaaz, has a long history of deceptive practices.

---

[8] *See United States of America v. Netbrands Media Corp.*, No. 4:10-cv-2175 (S. D. Tex. filed Jun. 18, 2010).

[9] *See id.*, ECF No. 1 at ¶¶ 2-6.

[10] *See* 24 Hour Wristbands Home Page (web archive dated Apr. 4, 2012), *available at* http://web.archive.org/web/20120404001120/http://24hourwristbands.com/.

70.     On information and belief, Netbrands has also routinely failed to remit charged state sales taxes to states and has commonly charged an undisclosed "insurance fee" on its invoices as well.

71.     Moreover, both Netbrands and Zaappaaz have been frequent targets of consumer complaints, earning "F" ratings from the Better Business Bureau.[11]

### B.  A History of Unfair Competition

72.     Founded at the same time, by CEOs who claimed a role in the founding of the CPP industry, Zaappaaz and Netbrands endured years of fierce competition.

73.     Both Zaappaaz and Netbrands have claimed to be the largest CPP provider in the industry, and attempted to cheat one another until, as alleged below, they realized that cooperation would be more profitable than competition.

74.     While Makanojiya takes credit for creating the industry as it now exists, Netbrands has stated in previous court filings that Zaappaaz and Makanojiya directly stole its web platform and redirected its web traffic.

75.     In 2010, Netbrands sued Zaappaaz and Makanojiya, along with several individuals who appear to be members of Makanojiya's family who were involved with Zaappaaz, for copyright infringement, unfair competition, fraud, conversion, and cyberpiracy in conjunction with their respective silicone wristband businesses.[12]

---

[11] *See* <u>Zaapaaz, LLC</u>, Better Business Bureau, <u>https://www.bbb.org/houston/business-reviews/internet-marketing-services/zaapaaz-llc-in-sugar-land-tx-90019860</u> (last visited Oct. 1, 2018); <u>Netbrands Media Corporation</u>, Better Business Bureau, <u>https://www.bbb.org/houston/business-reviews/promotional-products-wearable/netbrands-media-corporation-in-houston-tx-90002118/</u> (last visited Oct. 1, 2018).

[12] *See Lightbeam, Inc. v. Zaappaaz, LLC d/b/a Wrist-Band.com and d/b/a Customlanyard.net*, No. 4:10-cv-405 (S.D. Tex. filed Feb. 10, 2010).

76.     Netbrands alleged that Zaappaaz and Makonijiya, along with a company they hired in India, had submitted fake orders on Netbrands' website to figure out how Netbrands' ordering process worked.[13]

77.     The Netbrands complaint also alleged that Zaappaaz copied large parts of its website, including images,[14] and that Zaappaaz offered the same or substantially similar products and services at prices 30-40% below the Netbrands prices.[15]   Netbrands suggested that the purpose of this trickery was to allow Zaappaaz to duplicate that ordering process on its website and then to offer products and services similar to Netbrands' on its own website.

78.     Indeed, Netbrands admits that, until Netbrands sued for unfair competition, Zaappaaz and Makanojiya previously offered silicone wristbands at a substantial discount to Netbrands.

79.     Ultimately, in 2011, the case settled out of court, and the parties agreed to dismiss the lawsuit with prejudice.[16]   Both websites continued in operation and continued selling customized silicone wristbands, lanyards, and pin buttons but, following the civil settlement, the pricing pattern changed dramatically, and the companies' silicone wristband prices are now often nearly identical.

### C.  The Cooperation of Cartel Members

80.     Although the full scope of the conspiracy is not yet known to Plaintiffs, the Houston Defendants, in particular, decided at least as early as 2014 to speak to each other as well as to competitors whom they sought to turn into co-conspirators over text messages and through social

---

[13] *See id.*, ECF No. 29 at ¶¶ 3.7-3.8.

[14] *See id.* at ¶ 3.10.

[15] *See id.* at ¶ 3.12.

[16] *See id.*, ECF No. 26-31.

media messaging platforms in order to exchange information regarding the pricing of lots in multiples of 100 and to set prices between them.  On at least one occasion, the Houston Defendants met in person to set the price of silicone wristbands (and possibly other CPPs).

81.    In June 2014, Angeles (on behalf of Custom Wristbands) and "another competitor explicitly agreed to fix prices via e-mail."[17]  In that email, Angeles noted that he had agreed to match prices with his competitors and that, in committing his word, he did not wish to give any special prices to customers under the radar.

82.    Makanojiya "agreed with a competitor in February 2015 to implement an across-the-board price increase."[18]  On at least one occasion, the Houston Defendants met in person to set the price of silicone wristbands (and possibly other CPPs).  Similarly, in an October 2015 text exchange, Makanojiya and Zaappaaz "agreed with its competitors to eliminate a price discount."[19]

83.    In January 2016 messages seeking to bring a competitor into the cartel, Kurji directly stated, regarding his relationship with the other Houston Defendants, that "yes, prices have been set between the three of us.  We all met up."  Excerpts of these messages are reproduced below.

---

[17] *See* Plea Agreement at ¶ 20(c), *USA v. Christopher Angeles*, No. 4:17-cr-00509 (S.D. Tex. Dec. 21, 2017), ECF No. 50; Plea Agreement at ¶ 20, *USA v. Custom Wristbands, Inc.*, No. 4:17-cr-00510 (S.D. Tex. Feb. 6, 2018), ECF No. 47.

[18] *See* Plea Agreement at ¶ 20 (c), *USA v Azim Makanojiya*, 4:17-cr-00478 (S.D. Tex. Nov. 30, 2017), ECF No. 33.

[19] *Id*.



A — I can give you competitive prices

Mash contacted me asking me to raise my prices, says you and him and azim already agreed to not undercut each other. I haven't yet, not sure if he was lieing.

A — We did



← Akil Khurji

And that's why I want to work together with you to take on mash from a volume stand point. But yes prices have been agreed between the three of us. We all met up. And now your going to be part of the friendly competition

So with that being said im happy to share a lot of knowledge with you and help you with what I have learned so you don't burn money and waste time I had no one to help me but if we are going to work together then in happy to save you the growing pains man. You gotta stop being paranoid and trust me. Not everyone's out to get you

I burnt a lot of money the first two years didn't make jack shit. I know I can help you be very profitable and that's all that matters man. Margin margin margin or we can all fight and let



84.    The Houston Defendants created a chat group specifically to communicate with each other, as well as with other members of the industry.  From at least June 2014 through at least June 2016, employees of Defendant Zaappaaz, specifically Makanojiya, attended meetings and communicated through online messaging platforms (*e.g.*, Facebook, Skype, and WhatsApp) with other Defendants to fix the prices of CPPs.

85.    In March 2016, a Houston-based silicone wristband seller, Victor Rey, who owns a company called Wristband Connection, was approached by Defendants Ahmed of Netbrands and Kurji of Brandeco/Gennex, via text and Facebook messages, about joining the cartel.

86.    Defendant Kurji told Rey that Brandeco/Gennex, Custom Wristbands, Netbrands, and Zaappaaz had all agreed to fix prices rather than compete.  Rey notified the government about this communication, and agreed to wear a wire to record conversations with Defendants Ahmed, Kurji, and Makanojiya.

87.    In recorded conversations with Rey, Defendants Ahmed, Kurji, and Makanojiya discussed pricing, the private WhatsApp group that was used to discuss pricing, and the restaurants where they would meet to agree on pricing.

88.     When new companies entered the market, the conspirators would initially move prices down to the price point of the new competitor until they could convince the new competitor to move up to their price point.  Often, an agent of Defendants, frequently Ahmed or Kurji, would reach out directly to competitors and indicate that the Houston Defendants had all agreed on a price point, and that the competitor should adjust its pricing for the common good of all promotional products competitors.

89.     On at least one occasion, Ahmed indicated in conversation with a different competitor, Fiyyaz Pirani, whom he sought to turn in to a conspirator, that Custom Wristbands was fixing prices as part of the conspiracy that is the subject of this Complaint:





90.     This conversation between Defendants and a potential competitor, for example, involved having a director for one of the Defendants instruct a competitor to move his pricing for 1,000 debossed wristbands up by $10 per order to come in line with Defendants' pricing.

91.     As part of this same process, as discussed further above, Kurji reached out to Pirani to attempt to coerce him into doing the same.

92.     At least three of Defendants' competitors, including Messrs. Rey and Pirani, reported this conduct to the Federal Bureau of Investigation or the Department of Justice.  In June 2016, the FBI conducted simultaneous raids of Zaappaz, Netbrands, and Brandeco/Gennex.

## CLASS ACTION ALLEGATIONS

93.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities in the United States, including its territories and the District of Columbia who purchased customized silicone wristbands, customized lanyards, or customized pin buttons within the United States, including its territories and the District of Columbia, directly from one or more Defendants, or any of the predecessors, subsidiaries, or affiliates thereof, between June 1, 2014 and the present.

94.    Excluded from the Class are employees or agents of Defendants and their subsidiaries and affiliates, all persons who make a timely request to be excluded from the Class, and the judge to whom this case is assigned and her immediate family.  Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

95.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

96.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

97.    The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  The precise number of Class members is unknown to Plaintiffs at this time but may be ascertained from Defendants' records.  Plaintiffs are informed and believe that there are at least several thousand Class members.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, or published notice.

98.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a) Whether Defendants and their co-conspirators engaged in a conspiracy to fix, maintain, stabilize, or set prices for customized promotional products, including silicone wristbands, lanyards, and pin buttons;

(b) The identity of the participants of the alleged conspiracy;

(c) The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d) Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

(e)  Whether Plaintiffs and Class members were injured by Defendants' conduct; and

(f)  The appropriate class-wide measure of damages.

Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the wrongful conduct of Defendants, as described above.

99.    Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent.  Furthermore, Plaintiffs have retained counsel competent and experienced in complex class action litigation.  The Class' interests will be fairly and adequately protected by Plaintiffs, who intend to prosecute this action vigorously, and by Plaintiffs' skilled and experienced counsel.

100.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs

and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct.

101.    Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and to the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## RELEVANT MARKETS

102.    Defendants' horizontal price fixing is a *per se* violation of Section 1 of the Sherman Act.  Therefore, Plaintiffs are not required to define a relevant market.

103.    Nevertheless, if the Court determines that Plaintiffs' Sherman Act claim cannot proceed under a theory of *per se* horizontal price fixing, Defendants' anticompetitive conduct and agreements constitute a violation of the Sherman Act under the "rule of reason."  In that case, the relevant geographic market is the online market for CPPs in the United States, including its territories and the District of Columbia.

104.    Defendants operate websites that advertise and sell CPPs, including customized silicone wristbands, customized lanyards, and customized pin buttons, throughout the United States, including its territories and the District of Columbia, using online platforms.

105.    Defendants' market share for CPPs is not specifically known because marketing information sufficient to determine market share is unknown or unpublished.  However, Defendants Zaappaaz, Netbrands, Brandeco/Gennex, and Custom Wristbands each claim to be the largest seller of customized silicone wristbands, and on information and belief, the Houston

Defendants, together with Custom Wristbands, account for at least 90% of the market for customizable silicone wristbands.

106.   The relevant product markets are customized silicone wristbands, customized lanyards, and customized pin buttons.   Defendants Zaappaaz, Custom Wristbands, Gennex/Brandeco, and Netbrands compete for the sale of customized silicone wristbands. Defendants Zaappaaz, Custom Wristbands, Netbrands, and Brandeco/Gennex compete for the sale of customized lanyards.  Defendants Zaappaaz, Netbrands, and Brandeco/Gennex compete for the sale of customized pin buttons.

107.   Customized silicone wristbands and customized lanyards are sold exclusively or nearly-exclusively over the internet to enable the highest degree of customization possible and the shortest order fulfillment time.  Some factors, such as wristband width and color, lanyard material and clip, and method of customization (*e.g.*, embossment or debossment) are standardized across the industry.  Product offerings can be readily described using these features.  Customized pin buttons are frequently sold over the internet and are similarly customizable, both in size, color, and type of ink used in printing.  The customizable options for customized pin buttons are similarly standardized across the industry.

108.   There are no reasonably available substitutes for CPPs that are ordered online and manufactured to a customer's specifications then shipped directly to the customer.  If a customer could find a local business willing to create comparable CPPs, they would be far more expensive than those mass produced using modern high-technology equipment and sold by the Defendants.

109.   As a result of their anticompetitive conspiracy, the Defendants sell CPPs at prices well in excess of their marginal costs and the competitive price.  The Defendants have enjoyed

artificially high profit margins, especially when compared with online retailers of other types of mass-produced consumer goods.

## INTERSTATE COMMERCE

110.     Defendants manufactured or sold customized silicone wristbands and customized lanyards in the United States, including the District of Columbia and all territories, in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

111.     Defendants' business activities substantially affected interstate commerce in the United States, including the District of Columbia and all territories, and caused antitrust injury throughout the United States, including the District of Columbia and all territories.

## HARM TO COMPETITION DUE TO THE CONSPIRACY

112.     The anticompetitive conduct described in this Complaint enabled Defendants to maintain prices above competitive levels, to the detriment of Plaintiffs and other members of the Class.  This harm to Plaintiffs and the other Class members, in the form of paying artificially inflated prices for CPPs, constitutes cognizable antitrust injury and harm to competition under the antitrust laws.

113.     There are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint.

## ANTITRUST INJURY TO PLAINTIFFS AND MEMBERS OF THE CLASS

114.     During the Class Period, Plaintiffs and members of the Class purchased CPPs directly from Defendants.  Defendants' anticompetitive conduct alleged herein caused Plaintiffs and the other members of the Class to pay prices for CPPs that were inflated above competitive levels during and throughout the Class Period.

115.   If Defendants had not conspired with one another to fix prices, Plaintiffs and the other members of the Class would have paid substantially lower prices for CPPs during and throughout the Class Period.

116.   Because Defendants were successful in price-fixing, Plaintiffs and the other members of the Class have sustained, and continue to sustain, substantial losses in the form of artificially inflated prices paid to Defendants.  The full amount of such damages will be calculated after discovery and upon proof at trial.

117.   Injury to Plaintiffs and the other members of the Class was a direct and foreseeable result of Defendants' anticompetitive conduct.

118.   On information and belief, Defendants' anticompetitive conduct and the effects thereof are continuing, and so are the overcharges suffered by Plaintiffs and the Class caused by Defendants' conduct.

119.   The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## CLAIM FOR RELIEF
### Violation of Sections 1 and 3 of The Sherman Antitrust Act
### (15 U.S.C. §§ 1 and 3)

120.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

121.   As set forth above, Defendants were competitors in the market for CPPs.

122.   During the Class Period, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).  This horizontal price-fixing conspiracy is a *per se* violation of the Sherman Act.

123.    Specifically, Defendants have combined and conspired to raise, fix, maintain, or stabilize the price of customized promotional products in the United States.

124.    As a result of Defendants' unlawful conduct, prices for customized promotional products were raised, fixed, maintained, and stabilized in the United States.

125.    Each Defendant committed at least one overt act, such as arranging with a competitor to set the price of CPPs, to further the conspiracy alleged herein.

126.    The combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

127.    For the purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

a.      participating in meetings and conversations to discuss each other's customized promotional products business; and

b.      fixing, stabilizing, maintaining, or setting prices for CPPs.

128.    As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been injured in their business and property in that they have paid more for customized promotional products, including silicone wristbands and lanyards, than they otherwise would have paid in the absence of Defendants' unlawful conduct.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.      Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.      Damages in an amount to be determined at trial;

C.      Treble damages as permitted by applicable law;

D.      An order requiring Defendants to pay both pre- and post-judgment interest on any

amounts awarded;

E.      An award of costs and attorneys' fees; and

F.      Such other or further relief as may be appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial as to all issues so triable.

DATED this 2nd day of October, 2018.

BURNS CHAREST LLP

By: /s/ Warren T. Burns
**Warren T. Burns**
TSB# 24053119
SD Tex #611613
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone:   (469) 904-4550
Facsimile:    (469) 444-5002
Email:        wburns@burnscharest.com

**Korey A. Nelson** (*Pro Hac Vice*)
**Lydia A. Wright**(*Pro Hac Vice*)
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone:   (504) 799-2845
Email:        lwright@burnscharest.com

**Christopher J. Cormier** (*Pro Hac Vice*)
5290 Denver Tech Center Parkway, Ste. 150
Greenwood Village, CO 80111
Telephone: (720) 630-2092
Email:        ccormier@burnscharest.com

*Interim Lead Counsel for Plaintiffs and the Proposed Class*

WOLF HALDENSTEIN
ADLER FREEMAN & HERZ LLP
**Fred Taylor Isquith** (*Pro Hac Vice*)
**Thomas H. Burt** (*Pro Hac Vice*)
270 Madison Avenue
New York, New York 10016
Telephone:   (212) 545-4600

Facsimile:    (212) 686-0114
Email:        isquith@whafh.com
                burt@whafh.com

**Betsy C. Manifold** (*to be submitted Pro Hac Vice*)
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:    (619) 239-4599
Facsimile:    (619) 234-4599
Email:        manifold@whafh.com

**Carl V. Malmstrom** (*Pro Hac Vice*)
70 West Madison Street, Suite 1400
Chicago, Illinois 60602
Telephone:    (312) 391-5059
Email:        malmstrom@whafh.com

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
**Keith S. Dubanevich**
TSB# 06144150
SD Tex# 1451
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840
Email:        kdubanevich@stollberne.com

LEVIN SEDRAN & BERMAN LLP
**Austin Cohen** (*Pro Hac Vice*)
**Keith J. Verrier** (*Pro Hac Vice*)
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone:    (215) 592-1500
Email:        acohen@lfsblaw.com
                kverrier@lfsblaw.com

GUSTAFSON GLUEK PLLC
**Daniel E. Gustafson** (*Pro Hac Vice*)
**Daniel C. Hedlund** (*Pro Hac Vice*)
**Michelle J. Looby** (*Pro Hac Vice*)
**Kaitlyn L. Dennis** (*to be submitted Pro Hac Vice*)
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone:    (612) 333-8844
Email:        dgustafson@gustafsongluek.com
                dhedlund@gustafsongluek.com
                mlooby@gustafsongluek.com
                kdennis@gustafsongluek.com

RADICE LAW FIRM, P.C.
**John Daniel Radice**
34 Sunset Blvd.
Long Beach, NJ 08008
Telephone:    (646) 245-8502

Email:        jradice@radicelawfirm.com

HEIM PAYNE CHORUSH LLP
**Christopher Michael First**
**Miranda Yan Jones**
1111 Bagby Street, Suite 2100
Houston, TX 77002
Telephone:   (713) 221-2000
Facsimile:   (713) 22-2021
Email:        cfirst@hpcllp.com
              mjones@hpcllp.com

GRABAR LAW OFFICE
**Joshua H. Grabar**
1735 Market Street, Suite 3750
Philadelphia, PA 19103
Telephone:   (267) 507-6085
Email:        jgrabar@grabarlaw.com

EDELSON & ASSOCIATES LLC
**Marc Edelson**
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone:   (215) 867-2399
Email:        medelson@edelson-law.com

*Additional Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I certify that on October 2, 2018, I caused a true copy of the above document to be served electronically upon all counsel of record via the Court's CM/ECF system.

By:  /s/ Warren T. Burns
      Warren T. Burns